Filed
RECEIVED 792
aut

2012 MAY 22  AM 11: 44

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FL
JACKSONVILLE FLORIDA

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA
and THE STATE OF FLORIDA,

*ex rel.* CARMELLA GARDNER,

     PLAINTIFFS AND RELATOR,

     v.

UNIVERSAL HEALTH SERVICES, INC.;
PSYCHIATRIC SOLUTIONS, INC. f/k/a
PREMIERE BEHAVIORAL SOLUTIONS,
INC.; TBJ BEHAVIORAL CENTER, LLC
d/b/a RIVER POINT BEHAVIORAL HEALTH;
WEKIVA SPRINGS CENTER, LLC;
COMMUNITY REHABILITATION CENTER,
INC. and STANLEY TWIGGS,

     DEFENDANTS.

CIVIL ACTION NO.

3:12-CV-608-J-34JBT

17    3332

**FALSE CLAIMS ACT
COMPLAINT AND DEMAND
FOR JURY TRIAL**

**FILED IN CAMERA
AND UNDER SEAL**

9-1

## <u>TABLE OF CONTENTS</u>

|  |  | Page |
|---|---|---|
| I. | BACKGROUND | 1 |
| II. | FEDERAL JURISDICTION AND VENUE | 2 |
| III. | PARTIES | 3 |
| IV. | INDIVIDUAL PARTICIPANTS | 10 |
| V. | THE FALSE CLAIMS ACT | 11 |
| VI. | FEDERAL HEALTHCARE PROGRAMS | 13 |
| VII. | THE ANTI-KICKBACK STATUTE | 15 |
| VII. | FLORIDA'S ANTI-PATIENT BROKERING STATUTE | 17 |
| IX. | SUBSTANTIVE CLAIMS | 18 |

|  |  |  | Page |
|---|---|---|---|
|  | A. | Background | 18 |
|  | B. | Kickback Scheme for Referrals and Patient Brokering | 21 |
|  | C. | False Billings by Keeping Admitted Patients Longer Than Medically Necessary ("Ten Day Rule") | 26 |
|  | D. | Admission of Patients Who Did Not Meet Criteria and Who Could Not Benefit from Services | 27 |
|  | E. | River Point and Wekiva Discharged Patients as Soon as Benefits Ran Out, In Total Disregard of their Medical Condition | 29 |

| X. | CAUSES OF ACTION | 29 |
|---|---|---|

COUNT I
FALSE CLAIMS ACT--False Claim for Payment or Approval
31 U.S.C. §3729(a)(1)(A) and (C) (2010) .................................................29

COUNT II
FALSE CLAIMS ACT--False Records or Statements
31 U.S.C. §3729(a)(1)(B) and (C) (2010)..................................................32

Carmella Gardner ("Relator") brings this action on behalf of the United States of America ("United States") for treble damages and civil penalties arising from the conduct of Defendants Universal Health Solutions, Inc. ("UHS"); Psychiatric Solutions, Inc. ("PSI"); formerly known as Premiere Behavioral Solutions, Inc. (collectively "PSI"); TBJ Behavioral Center, LLC, a subsidiary of PSI (collectively "PSI") doing business as River Point Behavioral Health ("River Point"); Wekiva Springs Center, LLC ("Wekiva"); Community Rehabilitation Center, Inc. ("CRC") and STANLEY TWIGGS ("Twiggs") [collectively referred to as "Defendants"] in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729, et seq. ("FCA") and the Anti-Kickback Act, 42 U.S.C. §1320a-7b.  The violations arise out of false claims for payment made to Medicare, Medicaid, TRICARE, f/k /a CHAMPUS and CHAMPUSVA, Federal Employees' Health Benefits Program and other federally funded government healthcare programs including Florida KidCare (hereinafter, collectively referred to as "Government Healthcare Programs").

## I.    BACKGROUND

1.    This action is also brought under the *qui tam* provisions of the Florida False Claims Act on behalf of the State of Florida.  The State of Florida and the United States are hereafter collectively referred to as the "Government."

2.    As alleged herein, beginning as early as in or about 2005, Defendants caused thousands of false claims to be made on federal and state health care programs.  Defendants UHS, PSI, River Point and Wekiva[1] accomplished this by (a) engaging in a systematic program of "kickbacks" to CRC and Twiggs to entice them to refer and transfer patients to Defendants' in-patient behavioral health facilities; (b) admitting patients who did not meet the appropriate

---

[1]  And their predecessors, managing entities and successors.

1

admissions criteria as a means of "filling beds"; (c) mandating and enforcing the "ten day rule"

designed to increase the number of days each patient with federal benefits available would be

retained at the facilities regardless of medical necessity or benefit to the patient; (d) fraudulently

billing for patients who were admitted to the facilities as a result of the kickback scheme; (e)

fraudulently billing for services that were not medically necessary; (f) submitting false

statements and billings concealing the referrals (failing to disclose the violations of the anti-

Kickback Act).

     3.     These illegal actions and resulting false claims caused the government to pay out

funds that they otherwise would not have paid and unlawfully enriched Defendants.

     4.     PSI (later purchased and now owned by UHS) in particular has engaged in the

submission of false claims and other fraudulent conduct to increase its base of patient referrals

and length of patient stays in its facilities and has been the subject of federal investigations, class

action lawsuits and other Qui Tam litigation (unrelated to the State of Florida and the kickbacks

and frauds committed here).

## II.    FEDERAL JURISDICTION AND VENUE

     5.     The acts proscribed by 31 U.S.C. § 3729 *et seq.* and 42 U.S.C. § 1320a-7b and 7a,

and complained of herein occurred in the Middle District of Florida and possibly elsewhere, as

UHS/PSI does business in the Middle District of Florida and throughout the United States.

Defendants River Point, Wekiva, CRC and Twiggs are located in (or are residents of) the Middle

District of Florida. Therefore, this Court has jurisdiction over this case pursuant to 31 U.S.C. §

3732 (a), as well as under 28 U.S.C. §1345. This Court has supplemental jurisdiction over this

case for the claims brought on behalf of the State of Florida, pursuant to 31 U.S.C. §3732(b)

and/or 28 U.S.C. § 1367, inasmuch as recovery is sought on behalf of said State which arises

from the same transactions and occurrences as the claims brought on behalf of the United States.

2

6.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §

1391 because Defendants do business in Florida; Defendants River Point, Wekiva and CRC are

located in Florida; and Twiggs is a resident of the State of Florida.  The corporate Defendants

transact business and the individual defendant resides and conducts business in Florida and a

substantial part of the acts and omissions proscribed by section 31 U.S.C. §3729 occurred in this

State.

7.      This court has jurisdiction over the subject matter of this action pursuant to 31

U.S.C. § 3732(a) and 28 U.S.C. § 1331 and has personal jurisdiction over Defendants because

each of them do business, and the individual Defendant resides, in the Middle District of Florida.

The Jacksonville Division is the appropriate Division of this Court to hear a case involving these

facilities which are located in Duval County, Jacksonville, Florida.

8.      The facts and circumstances alleged in this complaint have not been publicly

disclosed in a criminal, civil or administrative hearing, nor in any congressional, administrative,

or government accounting office report, hearing, audit investigation, or in the news media.

9.      Relator is an "original source" of the information upon which this complaint is

based, as that term is used in the False Claims Act.

**III.    PARTIES**

10.     The United States funds the provision of medical care, including behavioral health

and psychiatric services, for eligible citizens through Government Healthcare Programs such as

Medicare, Medicaid, Federal Employees' Health Benefits Program,TR ICARE/CHAMPUS,

CHAMPVA, and other agencies and programs, acting through the Centers for Medicare &

Medicaid Services ("CMS") within the U.S. Department of Health and Human Services

("HHS"), the Department of Defense, and other federal agencies.

11.  .  The State of Florida partially funds and manages the Medicaid programs in Florida through the Florida Agency for Health Care Administration ("AHCA") and the Florida Department of Children and Families ("DCF").  Florida also administers the Florida KidCare programs.

12.  Relator Carmella Gardner is a citizen of the United States and a resident of the State of Florida.  As described in further detail below, as a result of being employed by River Point and in her position as supervisor of staff therapists, Gardner was provided access to information unavailable to the public and specifically information that forms the basis of this Complaint.  Relator was also employed (part-time) at Wekiva where she was given access to information unavailable to the public, including information on which this Complaint relies.  She is the original source of the facts and information hereinafter set forth concerning the illegal activities of the Defendants.

13.  Relator Gardner is a therapist who was employed for more than 20 years by River Point (and its predecessor companies).  Gardner began her career at River Point as a mental health technician.  She was promoted in 1988 to psychiatric assessment clinician/evaluator.  In 2004, she was promoted to Unit Supervisor of staff therapists for both the Emergency Stabilization and North Wing (Adult) Units.  In her capacity as supervisor, Relator was in charge of supervising ongoing patient care, discharge planning, staff time card review and other administrative and therapeutic responsibilities.  Gardner has a Masters Degree in Community Psychology and a Bachelors Degree in Social Work and Psychology.  She is licensed in the State of Florida as a Mental Health Counselor and Qualified Supervisor MHC, license number MH8370.  She has never been disciplined by the licensing authorities and has received no public complaints.  As a result of her strong work ethic and capabilities, Relator was also employed

4

part-time at Wekiva.  Shortly after Relator complained about the payment of unlawful kickbacks

to Twiggs and other fraudulent practices, and after years of exemplary performance evaluations,

she was terminated.  As a result of the anxiety and harassment she endured as a whistleblower,

Gardner suffered stress-related medical problems that required her to take a medical leave of

absence shortly before she was fired.

14.     Defendant Universal Health Services, Inc. ("UHS") is a publically traded

(NYSE:UHS) Fortune 500 company, incorporated in Delaware with its principal executive

offices at 367 South Gulph Road, King of Prussia, Pennsylvania 19406.  UHS is one of the

nation's largest healthcare management companies operating, through its subsidiaries nation-

wide, in 36 States, the District of Columbia, Puerto Rico and the U.S. Virgin Islands.  UHS

currently operates 25 acute care hospitals and 198 behavioral health facilities in addition to its

ambulatory surgical and radiation oncology centers.  For 2011, UHS reported net revenues of

$7,500,198,000 and an adjusted net income of $391,690,000.  UHS increased its net revenue by

35 percent between 2010 and 2011.  This increase is attributable, in part, to its acquisition of

Psychiatric Solutions, Inc. ("PSI") and PSI's subsidiaries, in November 2010.  By absorbing PSI,

UHS became the dominant player nationally in in-patient psychiatric care, with almost 200

facilities across the country.  UHS's Behavioral Health Division is now the largest facilities-

based behavioral healthcare organization in the country with annual revenue of $3.4 billion,

accounting for 45 percent of the corporation's annual revenue.

15.     UHS and its subsidiaries have been investigated by the government for a variety

of fraudulent practices in recent years.  At the time UHS acquired PSI, three of PSI's facilities

were under investigation by the Department of Justice, including Sierra Vista Hospital in

California, Friends Hospital in Philadelphia, Pennsylvania and Riveredge Hospital in Chicago,

Illinois.  In addition, PSI was subject to recoupment claims by the Virginia Department of

Medical Assistance Services relating to seven of its facilities in Virginia.  The Virginia

investigation resulted in a demand for repayment of funds for failure to comply with Medicaid

guidelines and policies.  In March of 2012, UHS settled a *Qui Tam* action for $6.85 million

dollars with the United States and the Commonwealth of Virginia based upon substandard care,

violations of Medicaid requirements, falsified records and submitting false claims to Medicaid

programs.  Another example of UHS' failure to comply with federal requirements and

inadequate patient care is UHS' Two Rivers Psychiatric Hospital[2] which, in April 2011, was

terminated from participation in Medicare and Medicaid programs.  The termination notice,

issued by the Centers for Medicare & Medicaid Services ("CMS"),  identified Two Rivers'

violation of the conditions of participation and failure to alleviate an "immediate jeopardy"

situation as grounds for termination.  A plan of correction allowed that facility to remain open

subject to the development and implementation, by independent experts, of plans for the facility

to meet the applicable Medicare conditions of participation.  UHS has been named a defendant or

settled other healthcare *Qui Tam* actions in recent years, including those involving the Alicante

School (California) and the Elmira School (California).

      16.     Psychiatric Solutions, Inc. was a publically traded (NYSE:PSYS) company

purchased by UHS in November of 2010.  PSI was a Delaware corporation with its principal

offices located at 6640 Carothers Parkway, Suite 500, Franklin, Tennessee 37067.  UHS

continues to use that office as its Behavioral Health Regional Office.  Prior to the purchase, PSI

had grown from five facilities in early 2003 to 95 in 2010, running about one in five free-

standing psychiatric facilities in the United States.  PSI claimed to be the leading provider of

---

[2]  Two Rivers Psychiatric Hospital is located at 5121 Raytown Road, Kansas City, Missouri.

inpatient behavioral health care services in the country.  With more beds than any other chain, PSI had about 8,800 patients on any given day.  PSI was very profitable, boasting double digit profits, far more than other facilities.  PSI's revenue in 2005 was $715.3 million increasing to over a billion dollars the next year (2006).  Roughly two-thirds of PSI's patient care was paid for by taxpayers.  PSI collected about $900 million from state and federal programs in the year 2007.  Annual per facility revenue increased nine percent in 2003 and 2004 and eight percent in 2005.  A former employee of PSI's Sierra Vista facility, Chad Thompson, was quoted in a magazine as stating he felt the chain put intense pressure on him to keep every bed full.  He described it as "totally driven by the almighty dollar" and "a money-centered approach."  By 2008, PSI hospitals were cited in three patient deaths and for placing patients in immediate jeopardy four times at one hospital facility alone.  Government investigations have found that staffing shortages and other cost-cutting measures resulted in inadequate medical care, and were combined with efforts to cover up these deficiencies from regulators.

17.     PSI's Florida facilities experienced the same pattern of placing profits over patient care.  In April 2010, ACHA found that the company had breached its court-ordered agreement to improve safety at its Manatee Palms Youth facility and halted all new admissions until the violations were corrected.  A few years earlier, the Palm Beach County grand jury condemned PSI for its mismanagement of the Florida Institute for Girls.  PSI was previously known as Premier Behavioral Solutions, Inc.

18.     Premier Behavioral Solutions, Inc. is a Delaware Corporation and predecessor/ subsidiary of PSI.  Premiere also did business as Premier Behavioral Solutions of Florida, Inc., a Delaware Corporation.  Premier operated the Manatee Palms Youth facility in Bradenton, Florida before becoming PSI.  In 2007, Manatee Palms' license was suspended by AHCA and all

admissions halted. The horrendous conditions of the facility are documented in AHCA's Final Order.[3] Premier Behavioral Solutions, Inc. purchased and operated TBJ Behavioral Center, LLC and its related entities and facilities including River Point.

19.    TBJ Behavioral Center, LLC was a wholly owned subsidiary of PSI. TBJ operated the Ten Broeck Hospital in Jacksonville. In 2009, Ten Broeck changed the name of the Jacksonville facility to River Point Behavioral Health which is a Florida registered fictitious name. TBJ Behavioral Center, LLC is registered in Florida as a foreign limited liability company with its principal address of 367 South Gulph Road, King of Prussia, Pennsylvania. TBJ operated as River Point until it was acquired ultimately and currently by UHS.

20.    River Point Behavioral Health is a registered Florida Fictitious Name for the behavioral health facility operated at 6300 Beach Boulevard, Jacksonville, Florida 32216. River Point is owned and operated by TBJ which is a wholly owned subsidiary of UHS. It employed Relator for more than 20 years before her retaliatory termination in 2012.

21.    Wekiva Springs Center, LLC does business as Wekiva Springs Center, a behavioral health facility located at 3947 Salisbury Road, Jacksonville, Florida 32216. It is owned by Premier, a subsidiary of UHS.

22.    Community Rehabilitation Center, Inc. is a Florida Not-For-Profit Corporation with its primary offices at 623 Beechwood Street, Jacksonville, Florida 32209. It is tax exempt under IRS:EIN 59-3198739. CRC provides out-patient behavioral health services including psychiatric evaluations, bio-psychological evaluations, treatment planning, day treatment, individual and group therapy, case management and vocational rehabilitation services in Jacksonville and St. Augustine, Florida. CRC was co-founded by Reginald Gaffney and Stanley

---

[3]  AHCA No. 2007004716, May 23, 2007.

8

Twiggs in 1993.  CRC's current building was purchased in 1998.  In 2011, CRC opened a second

service site in St. Augustine.  In addition, Gaffney and Twiggs share ownership and are directors

of other entities[4] which CRC asserts are part of an "economic development" initiative involving

the strip mall which houses CRC and other Twiggs/Gaffney businesses.  The strip mall received

federal "streetscape improvements and renovations federal funds" as a result of efforts by United

States Representative Corrine Brown.  Some of these businesses are "For-Profit" and owned by

Twiggs and Gaffney.

  23. CRC has had its own share of controversy.  CRC reportedly received more than

$2.3 million in government grants and another $2.4 million in Medicaid payments in 2010.  CRC

received similar taxpayer support in the prior years but continued to operate at a deficit.  CRC

has a highly publicized relationship with United States Representative Corrine Brown, who

helped obtain nearly one million dollars in federal funding directly and indirectly to CRC

between 2008 and 2010.  During years 2005 and 2008, CRC paid $185,000 to Alcalde and Fay,

out-of-state lobbyists that employ Representative Brown's daughter.  On a more local level, CRC

reportedly bought Mayor (then mayor-elect) Alvin Brown's house for more than double the price

that Brown, an "advisor" to CRC, had paid for the residence.

  24. Stanley Twiggs is the co-founder[5] (with Reginald Gaffney) of CRC.  He is the

Operations Director for the Center while Gaffney serves as Executive Director.  Twiggs and

---

[4]  Second Time Around Thrift Shoppe, Inc. (Active); Beyond Graphics, Inc. (Active); Northwest
Support Services, Inc. (For Profit-Active); Quick Break Café, Inc. (For-Profit-Dissolved 5-1-
2012) reinvented as a "not-for-profit"corporation; Community Affordable Supported Housing,
Inc. (inactivated in 2011); Community Rehabilitation Center Transportation I, Inc. (Dissolved
2007); Community Rehabilitation Center Enterprises Of Jacksonville, Inc (Administratively
Dissolved in 2011); North Florida Behavioral Health Coalition, LLC (For Profit **with Emma
Hayes** as Managing member-Administratively dissolved in 2006).

[5]  M. Saleh, M.D. also claims to be a co-founder of CRC.
http://www.zencity.net/1888drsaleh/autobio.hmtl

Gaffney are involved in numerous other businesses together.  Twiggs, as will be further described below, and acting for himself and CRC,  received kickbacks for more than 10 years from River Point and Wekiva to exclusively refer patients of CRC to River Point and Wekiva. This direct payment kickback scheme continued until November 2011.  Twiggs and CRC also benefitted from a related scheme where River Point and Wekiva would refer its patients to CRC for out-patient treatment despite the availability of other similar programs and facilities that were economically, geographically and otherwise more appropriate for patients.

## IV.    INDIVIDUAL PARTICIPANTS

25.    Gayle Eckerd ("Eckerd") became the Chief Executive Officer of River Point in 2009.  Eckerd came to River Point from a private psychiatric facility in St. Simons Island, Georgia (also a UHS facility) where she had successfully increased the profitability of the hospital.  Eckerd received her undergraduate degrees in political science and French from the University of Western Ontario and her graduate degree in education from Georgia State University.  Eckerd was later made CEO of Wekiva.  Eckerd inherited the kickback scheme from her predecessors at River Point and Wekiva.  She continued the kickbacks and enhanced the scheme.

26.    Emma Hayes ("Hayes") is the Director of Clinical Services at River Point.  Hayes is in charge of all therapeutic staff.  Hayes coordinated the kickback scheme, payments and cover-up.  She also had outside business relationships with CRC, Gaffney and the former medical director at River Point (Ten Broeck Hospital), Mohammed Saleh.[6]

---

[6]  Hayes was a managing member of North Florida Behavioral Health Coalition, LLC, a For-Profit business also managed and owned by Reginald Gaffney.  She was the Technical director of the Eritrean Psychiatric Foundation, Inc., whose president was Mohammed Saleh.  Saleh also credits Emma Hayes with helping him as "a key player" in Quality of Life Center of Jacksonville.

27.     Cheryl Bullard is the Chief Financial Officer of River Point and was aware of the kickback payments and expressed concern about their legality.

28.     Stella Bryskin is the Marketing Director of River Point and Wekiva and was aware of the various illegal methods used to fill beds and bill for medically unnecessary services.

29.     Dr. Pradeep Arora is the Medical Director of River Point.

30.     Pat Grunewald is the Nurse Executive, another member of senior staff.

31.     Mohammed Saleh, M.D. was former medical director of River Point and CRC. He had been in business with Emma Hayes previously and claims to have been a co-founder of CRC. He settled a wrongful death lawsuit that alleged a patient of River Point was improperly discharged from the hospital and committed suicide hours later.

32.     Jeanna McIntosh is Director of Risk Management/Health Information Management.

33.     Cathy Calhoun is PHR - Director of Human Resources.

34.     Sabrina Campbell is the Business Office Director.

35.     Donna McGinley, Ph.D., LMHC, NCC is Director of Evaluation & Referral and Utilization Review.

36.     Reginald Gaffney is co-founder and Executive Director of CRC. He is involved in many businesses with Twiggs and was involved in at least one company, which is now inactive, with Emma Hayes.

V.     THE FALSE CLAIMS ACT

37.     The False Claims Act (hereinafter referred to as "FCA"), 31 USC § 3729, was originally enacted in 1863, and was substantially amended in 1986 by the False Claims Amendments Act, Pub.L. 99-562, 100 Stat. 3153. The FCA was further amended in May 2009

11

by the Fraud Enforcement and Recovery Act of 2009 ("FERA") and again in March 2010 by the

Patient Protection and Affordable Care Act ("PPACA").  Congress enacted the 1986 amend-

ments to enhance and modernize the Government's tools for recovering losses sustained by

frauds against it after finding that federal program fraud was pervasive.  The amendments were

intended to create incentives for individuals with knowledge of Government fraud to disclose the

information without fear of reprisals or Government inaction and to encourage the private bar to

commit resources to prosecuting fraud on the Government's behalf.  The FCA was further

amended in May 2009 by the Fraud Enforcement and Recovery Act of 2009 ("FERA") and again

in March 2010 by the Patient Protection and Affordable Care Act ("PPACA").  Both FERA and

PPACA made a number of procedural and substantive changes to the FCA in an attempt to ease

the burden on the government and Relators in investigating and prosecuting *qui tam* suits under

the FCA.

38.     The False Claims Act generally provides that any person who knowingly presents,

or causes to be presented, false or fraudulent claims for payment or approval to the United States

Government, or knowingly makes, uses, or causes to be made or used false records and

statements material to a false claim, or conspires to engage in such conduct, is liable for a civil

penalty ranging from $5,500 up to $11,000 for each such claim, plus three times the amount of

the damages sustained by the Federal Government.

39.     The Act allows any person having information about false or fraudulent claims to

bring an action for himself or herself and the Government, and to share in any recovery.  Based

on these provisions, Relator seeks, through this action, to recover all available damages, civil

penalties, and other relief for state and federal violations alleged herein.

12

40.    In addition, the Act provides for compensation to any person who is discharged, demoted, suspended, threatened, harassed, or in any manner discriminated against in the terms and conditions of employment because of lawful actions done by the employee in furtherance of an action under the FAC or other efforts to stop the violations of the False Claims Act.

## VI.    FEDERAL HEALTHCARE PROGRAMS

41.    In 1965, Congress enacted Title XVIII of the Social Security Act (known as "Medicare" or the "Medicare Program") to pay for the cost of certain medical services and care. Entitlement to Medicare is based on age, disability or affliction with certain diseases. See 42 U.S.C. §§1395 to 1395ccc. Outpatient prescription drugs are covered under Parts A-D of the Medicare Program.

42.    In 1965, the Federal Government also enacted the Medicaid program. Medicaid is the nation's medical assistance program for the needy, the medically-needy aged, blind, and disabled and families with dependent children. 42 U.S.C. §§ 1396-1396v. Medicaid is largely administered by the states and funded by a combination of federal and state funds. The State of Florida contributes roughly one-half of Medicaid funding with the federal government providing the balance of the funding. Among other forms of medical assistance, the Medicaid programs cover outpatient prescription drugs. 42 U.S.C. §§ 1396a (10)(A) and 1396d (a)(12).

43.    Medicare is the nation's health program for persons over 65 and the disabled. Medicare is funded by the Federal Government. Medicare Part B has long covered outpatient prescription drugs that are provided to a patient "incident to" a physicians' services, and drugs that are required for the effective use of durable medical equipment. 42 U.S.C. § 395x(s)(2)(A).

44.    The Federal Employees' Health Benefits Program (FEHB) is a health care program for federal employees, retirees and their families. It is codified in 5 U.S.C.A. §8901 *et seq.* The fund is administered by the Treasury through the Federal Employee Health Benefit

13

Fund (FEHBA). 5 U.S.C.A. §§8906, 8909. The program itself is administered by the Office of Personnel Management.

45.     TRICARE Management Activity, formerly known as CHAMPUS, is a program of the Department of Defense that helps pay for covered civilian health care obtained by military beneficiaries, including retirees, their dependents, and dependents of active-duty personnel. 10 U.S.C. §§ 1079, 1086; 32 C.F.R. Part 199. TRICARE contracts with fiscal intermediaries and managed care contractors to review and pay claims, including claims submitted for surgical procedures.

46.     The Department of Veterans Affairs ("VA"), through programs such as CHAMPVA and other programs, provides medical assistance, including surgical coverage, for discharged veterans as well as the spouses and children of deceased and disabled veterans.

47.     Under the Medicare Act, 42 U.S.C. § 1395y(a)(1)(A), there is an express fundamental condition of payment: "no payment may be made [under the Medicare statute] for any expenses incurred for items or services which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury." This condition links each Medicare payment to the requirement that the particular item or service be "reasonable and necessary." Medicaid, TRICARE, EHBP and other federally funded programs restrict coverage under the same principle.

48.     Hospitals and doctors and other service providers participating in the Medicare, Medicaid and other federally funded Government Healthcare programs are required to comply with regulations promulgated by the government, including admissions criteria, patient retention standards, treatment per day to be provided and discharge standards.

49.     Medicare and the other federally funded programs require the submission of documented and properly coded claims.

## VII.   THE ANTI-KICKBACK STATUTE

50.     The federal health care Anti-Kickback statute, 42 U.S.C. §§1320a-7a and 7b, arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of federal health care programs from these difficult-to-detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

51.     The Anti-Kickback statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for the purchase of any item or service for which payment may be made under a federally-funded health care program.  42 U.S.C. §1320a-7b (b).  Under this statute, companies and persons may not offer, pay, solicit to receive, or receive any remuneration, in cash or kind, directly or indirectly, in return for referring an individual to a hospital for the furnishing of services for which payment may be made by a federal or state health care program.

52.     Violation of the Anti-Kickback statute subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment.  42 U.S.C. §§1320a-7(b)(7), 1320a-7a(a)(7).

53.     Compliance with the Anti-Kickback law is a precondition to participation as a health care provider under the Medicare, Medicaid, FEHBP, CHAMPUS/TRICARE, and other federal health care programs.  With regard to Medicaid, for example, each physician and hospital

15

that participates in the program must sign a provider agreement with his or her State. Although there are variations in the agreements among the states, the agreement typically requires the prospective Medicaid provider to agree that he or she will comply with all Medicaid require-ments, which include the Anti-kickback provisions. In Florida, the Medicaid claim form itself contains a certification by the provider that the provider has complied with all aspects of the Medicaid program, and other state and federal laws and warns of civil and criminal penalties for noncompliance. Use of the electronic claim submission has similar claim certification referring to the paper certification for all inclusive language.

54. Likewise, with regard to Medicare, all providers and suppliers must complete a Medicare enrollment form before receiving payments from the programs. The following forms must be completed and submitted to the applicant's proper Medicare Contractor in their given region: (a) provider entities complete the CMS Form 855A to enroll in Medicare Part A; (b) supplier entities (*e.g.,* clinics and group practices) complete the CMS Form 855B to enroll in Medicare Part B; and (c) individuals (*e.g.,* physicians and other practitioners) complete CMS Form 855I. All three CMS 855 forms contain a materially identical certification that the applicant agrees to abide by all Medicare laws, including the anti-kickback statute, and that payment is conditioned upon compliance with these statutes and regulations. The Certifications specifically state: "I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark Law), and on the provider's compliance with all applicable conditions of participation in Medicare." *See* CMS 855A at 37; 855B at 30; 855I at 25.

16

55.     In sum, either pursuant to provider agreements, claims forms, or other appropriate manner, hospitals and health care providers who participate in a federal health care program generally must certify that they have complied with the applicable federal rules and regulations, including the Anti-Kickback laws.

56.     Any party convicted under the Anti-Kickback statute must be excluded (i.e., not allowed to bill for services rendered) from federal health care programs for a term of at least five years. 42 U.S.C. §1320a-7(a)(l).  Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider from the federal health care programs for a discretionary period (in which event the Secretary must direct the relevant State agency(ies) to exclude that provider from the State health program), and may consider imposing administrative sanctions of $50,000 per kickback violation.  42 U.S.C. §1320a-7(b)and 7a(a).

57.     The enactment of these various provisions and amendments demonstrates Congress' commitment to the fundamental principle that federal health care programs will not tolerate the payment of kickbacks.  Thus, compliance with the Anti-Kickback statute is a prerequisite to a provider's right to receive or retain reimbursement payments from Medicaid and other federal health care programs.  Reimbursement is also prohibited by the general legal principle that providers who are corrupt or unethical or violate the integrity of a government program involving government funds are not entitled to payment from the public treasury for the resulting claims.

## VIII.  FLORIDA'S ANTI-PATIENT BROKERING STATUTE

58.     In addition to Florida's Anti-Kickback provisions (F.S. §409.920 (2009)), Florida specifically prohibits the offer to pay or payment of any commission, bonus, rebate, kickback, or

bribe, directly or indirectly, in cash or in kind, or to engage in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility.  F.S. §817.505 (2006).

59.    The law also prohibits and sanctions the solicitation or receipt of any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or to engage in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility or to aid or abet such an arrangement.

## IX.    SUBSTANTIVE CLAIMS

### A.    Background.

60.    Ten Broeck Jacksonville opened in 1999 as a 99-bed inpatient psychiatric and chemical dependency hospital.  Mohammed Saleh served as one of its medical directors until he was sued for medical malpractice after a patient committed suicide hours after she was released from Ten Broeck.  Shortly thereafter the hospital was renamed as River Point Behavioral Health.

61.    River Point received most of its patients from Jacksonville and the surrounding area.  A majority of its billings were to government healthcare programs such as Medicare, Medicaid and Tricare.  River Point is also a "Baker Act" receiving facility.[7]

62.    River Point advertised that it offered a continuum of specialized services for youth, adults and seniors.  Levels of care included inpatient, residential, partial hospitalization

---

[7]  The Florida Mental Health Act of 1971 (commonly known as the "Baker Act") provides guidelines for involuntary "examination" and placement.  Law enforcement, judicial officers, therapists and mental health professionals may institute an involuntary examination.  The "examination" and emergency treatment may last up to 72 hours after a person is deemed in need of evaluation.  There must be evidence that the person has a mental illness (as defined in the Baker Act) or is at risk of harming himself or others in order to be involuntarily held.  When the examination under the Baker Act reveals grounds for continued involuntary placement or prolonged treatment, a court order must be obtained.

and intensive outpatient programs.  Staff includes health care professionals in the fields of psychiatry, medicine, nursing, social services, education and activity therapy.

63.   Wekiva Springs Center is a 68-bed private psychiatric hospital and a sister facility to River Point.

64.   Gayle Eckerd is the CEO of both River Point and Wekiva.  Eckerd was moved to River Point in 2009 from another UHS hospital, Saint Simons-By-The-Sea located on Saint Simons Island, Georgia.  Shortly thereafter she became CEO of Wekiva as well.  Eckerd's installation as CEO of the Jacksonville facilities was to increase what UHS considered lackluster financial performance, just as she had done at St. Simons.

65.   The Center for Women at Wekiva Springs specializes in treating physical, psychological, social and emotional issues of women only.  Treatment is individualized, holistic, multifaceted and multidisciplinary.  Assessments include comprehensive medical, psychiatric and social evaluations.  The assessments are advertised as providing a plan to promote mental wellness and recovery.  Interventions may include crisis intervention, daily individual consultation with a physician, group therapy, family therapy, nutritional education, medication management and recreational therapies.

66.   The Men's Retreat at Wekiva is a 20-bed unit located on the acute care wing at Wekiva Springs Center.  The program specializes in the treatment of mood disorders, anxiety disorders, substance abuse and chemical dependency.  Detoxification and rehabilitation treatment are also available.  Gender-specific treatment is offered which focuses on relationships, communication and anger management.  Interventions may include crisis intervention, daily individual consultation with physician, group therapy, family therapy, nutritional education, medication management and recreational therapies.

19

67.     River Point and Wekiva advertise a range of services including:

- Inpatient mental health services
- Fully licensed primary care (30-45 days) residential treatment program accredited by the Joint Commission on Accreditation of Healthcare Organizations
- Partial Hospitalization Program and Intensive Outpatient Program for transition and continued recovery
- Detoxification
- A comprehensive addiction program based on the 12-step philosophy of treatment
- Intensive groups and individual therapy sessions
- Nutritional, recreational, experiential, and spiritual wellness therapies
- Customized fitness programs
- Trauma recovery
- Depression, anxiety and other mood disorders intervention and counseling
- A serene, safe environment for healing
- Support and guidance for family members

68.     Relator, Carmella Gardner was employed by River Point (Ten Broeck) for more than 20 years, from November, 1991 until her termination on February 17, 2012.  Relator was terminated after decades of exemplary performance evaluations, promotions and shortly after she complained to Eckerd about the kickback scheme and other fraudulent practices.  The anxiety Relator endured as a whistleblower contributed to stress-related medical problems that required her to take medical leave shortly before her termination.

69.     Gardner began her career at River Point as a mental health technician, assisting with the care of mental health patients.  She was promoted in May 1988 to Psychiatric Assessment Clinician / Evaluator.  In that capacity, she determined whether or not prospective patients met admissions criteria.  In May 2004, Gardner was made the supervisor of staff

20

therapists on the adult units handling serious cases of schizophrenia, depression and substance

abuse. Her responsibilities included supervising ongoing patient care and discharge planning.

70.     As a supervisor, Gardner learned of several fraudulent practices that were used by

River Point to increase revenue. These fraudulent practices included:

- Paying kickbacks for referrals;
- Retaining patients improperly to exhaust insurance benefits;
- Admitting unsuitable patients based on the availability of government or private insurance coverage;
- Group therapy sessions conducted by interns, unlicensed staff, and even former patients;
- Required psycho-social medical forms being completed and signed by interns and unlicensed employees. (These forms capture a patient's psychiatric and social history within 72 hours of admission, and form the basis for placement, treatment plans and length of stay.)

**B.     Kickback Scheme for Referrals and Patient Brokering.**

71.     Relator learned that River Point were paying kickbacks to Stanley Twiggs in

exchange for patient referrals. Gardner found out that this kickback scheme had been going on

for more than 10 years.

72.     Twiggs was Operations Director for CRC and in a position to have patients

transferred to and referred to River Point and Wekiva inpatient treatment facilities. Twiggs was

never employed by River Point or Wekiva and there was no written agreement between CRC and

River Point or Wekiva. CRC is a nonprofit social services agency providing a variety of primary

care and out-patient behavioral services for under-served individuals with mental illness, sub-

stance abuse and HIV/AIDS in the Jacksonville area.

73.     Twiggs was paid a twice-monthly kickback by River Point to refer CRC patients

exclusively to River Point and Wekiva, despite the availability of other inpatient treatment

facilities. Twiggs received a twice-monthly kickback payment, by check, from River Point. The

21

amount of the payment was approximately $300 twice per month, but varied based upon the number of patients that he referred that month.

74.     Twiggs was also given a cellular telephone (904-249-7135) to facilitate the kickback/referral scheme and was listed on the company phone directory.  The telephone and bills were part of the kickbacks and paid for by PSI/UHS.

75.     Eckerd, who became CEO of River Point and Wekiva in 2009, inherited the kickback scheme from her predecessor, Paul Andrews.  To succeed in growing revenue, Eckerd continued the kickback payments to Twiggs.  As further described below, Eckerd also innovated other fraudulent practices at River Point and Wekiva.

76.     As part of the kickback scheme, whenever the census at River Pont fell below 93, Twiggs was expected to provide referrals to get the remaining beds filled.  Most of the "referrals" were Medicaid and Medicare patients of CRC.

77.     In addition to being paid kickbacks for his brokering of patients, Twiggs and CRC received out-patient referrals from River Point and Wekiva.[8]  For years, Gardner and other staff members were directed that, when outpatient treatment was recommended, all outside referrals were to be made to CRC regardless of the availability of other providers which were geographically more advantageous or provided programs more beneficial to the patients.

78.     Emma Hayes, the Director of Social Services was in charge of all therapeutic staff.  Hayes coordinated the kickback scheme, created false time cards for Twiggs, determined the amount of his twice-monthly payment based upon number of patients referred and directed the mailing of his checks.

---

[8] Upon information and belief, Reginald Gaffney, as a close associate of Twiggs, Selah and Hayes and as the Executive Director of CRC was involved in the fraudulent patient brokering and kickback scheme.  Relator has no direct knowledge of any payment made specifically to Gaffney.

22

79.     Until being demoted, on February 6, 2012, Gardner was responsible for reviewing all time cards for Social Services' employees and was tasked with ensuring that all hours worked were documented on a time-clock stamped card, before being sent to payroll for processing. Although Twiggs was given the title "community liaison" in the social services department, he did not have a time-clock stamped time card.

80.     Twiggs was paid through the use of a dummied time card which was personally prepared by Hayes.  Twiggs was on the payroll of Admissions while Hayes was in charge of that department.  Like actual River Point employees, Twiggs was paid every two weeks by company check.  Since Twiggs did not perform any actual work at or for the hospital(s), the Relator was directed by Hayes to mail the check to his home address.

81.     As a result of the Kickback scheme, patients were referred to and admitted at River Point and Wekiva.  These patients[9] included:

- Frederico R.
- Linda L.
- Booker O.
- Cory McB.
- Kimberly C.
- James B.
- Maurice W.
- LaShawn J.
- David J.
- Helen B.
- Kevin G.
- Linda B.
- Wesley D.
- Mark C.
- Willie W.
- Debbie M.
- Ricky G.
- Patrick M.
- William H.

---

[9] All patients shall be identified by first name and last initial in this Complaint.

23

- Brian J.
- Kevin McC.
- Dennis W.
- Larry B.
- Nelson G.

82.     Medicare regulations require that someone with Hayes' supervisory therapeutic

responsibilities must be a Licensed Social Worker (LSW).  Hayes does not meet the educational

requirements for licensing as a LSW.  Hayes is a licensed mental health counselor.[10]  To conceal

this deficiency, for several years, Eckerd falsely listed Terry Ramer, LSW as the individual with

supervisory responsibility for Social Services at the hospital.  In reality, Terry Ramer was a full

time employee at Shands Hospital in Jacksonville and only worked part-time on weekends as a

therapist at River Point.[11]

83.     Sometime in 2009, Donna McGinley was put in charge of admissions at River

Point.  Until then, Hayes had been in charge of both Admissions and Social Services.  When

McGinley took over, she voiced concerns to Relator and Eckerd about Twiggs being on her

payroll.  McGinley made it clear that she believed the payments to Twiggs were improper and

likely illegal.  As a result of her concerns with the legality of the kickback payments to Twiggs,

he was "moved" to Social Services.  Hayes remained in charge of that Department and continued

to handle the kickback payments.

84.     Cheryl Bullard, River Point's CFO, was also very much aware of, and concerned

about, these illegal kickbacks.  Bullard expressed these concerns in Relator's presence.

---

[10]  Emma Hayes is actually Emmeline Louise Hayes; Florida Mental Health Counselor license
no. MH4054.

[11]  Terry Ramer still works part-time at River Point, but the deception continues and she has been
replaced by a new bogus surrogate, Maria Benavides, a LSW who is a full-time River Point
therapist.